**BRIDGEPORT FITTINGS, INCORPORATED, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

Nos. 843, 962, Dockets 88–4142, 88–4158.

United States Court of Appeals, Second Circuit.

Argued Feb. 27, 1989.

Decided June 5, 1989.

Johnna G. Torsone, New York City (Lucinda M. Cardinal, Parker, Chapin, Flattau & Klimpl, New York City, of counsel), for petitioner, cross-respondent.

Steven B. Goldstein, Atty. N.L.R.B., Washington, D.C. (William R. Stewart, Deputy Asst. Gen. Counsel, Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent, cross-petitioner.

Before PIERCE and ALTIMARI, Circuit Judges, and KELLEHER, District Judge.[*]

PIERCE, Circuit Judge:

Bridgeport Fittings, Inc. ("the Company") petitions for review of a decision and order of the National Labor Relations Board ("the Board") which held that the Company violated §§ 8(a)(1) and (a)(5) of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 158(a)(1), 158(a)(5) (1982), by refusing to bargain with the Bridgeport Fittings Employees Association ("the BFEA"), a labor organization which the Board certified as the collective bargaining representative of a group of the Company's employees. The Board petitions for enforcement of its order directing the Company to bargain with the BFEA upon request.

We conclude that none of the Company's numerous challenges to the Board's certification of the BFEA establishes that the Board abused its discretion during the representation proceeding. Hence, we deny

---

[*] Hon. Robert J. Kelleher, Senior Judge, United States District Court for the Central District of California, sitting by designation.

the petition for review and enforce the order.

## BACKGROUND

The Company, a Connecticut corporation, manufactures electrical fittings at its plant in Stratford, Connecticut. For approximately forty-seven years, until the events at issue, Local 2015 of the International Brotherhood of Electrical Workers, AFL–CIO ("the IBEW") served as the collective bargaining representative of a group of employees at the Company's plant. On February 21, 1984, an employee of the Company, one Derwin Gonzalez, filed a petition with the Board seeking to have the IBEW decertified. Gonzalez was an in-plant organizer for Local 1040 of the Brewery and Soft Drink Workers, Liquor Drivers, and New and Used Car Workers ("Local 1040"), an organization affiliated with the International Brotherhood of Teamsters ("the Teamsters"). Two days after Gonzalez filed his petition, Local 1040 filed a petition for certification as the representative of the Company's production and maintenance workers.

Shortly after these petitions were filed, the employees of the Company who constituted Local 1040's in-plant organizing committee were informed that, because of a "no-raid" pact between the Teamsters and the IBEW, Local 1040 would be withdrawing its petition. These employees then formed the BFEA. Following its formation, the BFEA admitted employees to membership, collected voluntary contributions, conducted meetings at which officers were elected, and established a bank account.

After a hearing, in which the BFEA intervened, the Acting Regional Director of Region One of the Board ("the Director") issued a decision dated July 3, 1984, in which he granted Local 1040's request to withdraw its petition and, despite the Company's and the IBEW's objections, held that the BFEA was eligible to appear on a representation election ballot. The Director ordered that an election be held to determine whether the members of the bargaining unit wished to be represented by the IBEW, the BFEA, or neither organization.

On July 24, 1984, the Company filed with the Board a request for review of the Director's decision, arguing that the BFEA was no more than a "front" for the Teamsters and therefore should be barred from the election. In its request, the Company alleged that it had newly discovered evidence that, at a meeting of the BFEA in June 1984 ("the June meeting"), Gonzalez, who had been elected vice-president of the BFEA, announced that if the BFEA won the election it would cede its certification to Local 1040.

On August 1, 1984, the election was held and, by order of the Board, the ballots were impounded. On August 3, 1984, the Board granted the Company's request for review "solely with respect to the alleged 'newly discovered' evidence arising out of [the June] meeting," remanded for a further hearing on this issue, and denied the request "in all other respects."

In response to the Board's remand, the Director conducted another hearing ("the reopened hearing"), during which the Company was given an ample opportunity to present evidence that the BFEA was a front for the Teamsters. The Director then issued a supplemental decision, dated October 26, 1984, affirming his original decision. In the supplemental decision, the Director wrote that the evidence adduced at the reopened hearing was insufficient to support a finding that the BFEA intended, if it won the election, to cede its certification to Local 1040.

On January 15, 1985, the election ballots were counted. The tally showed that 210 of the approximately 235 eligible employees cast valid votes. Of these 210 valid votes, 138 were in favor of the BFEA, 66 were in favor of the IBEW and 6 favored not having either organization as the bargaining representative. On January 21, 1985, the Company filed objections to the conduct of the election and argued that the election results must be set aside on the grounds, *inter alia*, that confusion and fear tainted the election process; that members of the BFEA disclaimed the

BFEA's interest in representing the employees; and that the BFEA was merely a front for Local 1040. The IBEW also filed objections.

After an investigation into the Company's and the IBEW's objections, the Director issued a second supplemental decision dated May 17, 1985. In the decision, he considered all of the objections and, finding them to be without merit, certified the BFEA as the employees' representative. The Company filed numerous exceptions to the Director's second supplemental decision and both the Company and the IBEW requested a review by the Board.

On October 21, 1985, the Board denied these requests, holding that they raised no substantial issues warranting review. Chairman Dotson dissented from this denial, on the ground that the ballot used in the election was defective. On November 1, 1985, the Company filed a motion for reconsideration. Well over two years later, in a decision dated March 23, 1988, the Board denied the motion for reconsideration, holding that the ballot used in the election was not so defective as to warrant overturning the election.

While the motion for reconsideration was pending, the BFEA, on or about April 2, 1986, requested that the Company bargain with it. The Company refused to bargain and continues to refuse to bargain. In a complaint dated June 16, 1986, the General Counsel of the Board charged that the Company's refusal to bargain constituted an unfair labor practice under the Act.

After the Board issued its denial of the Company's motion for reconsideration, the General Counsel moved for summary judgment on the charge against the Company. In a decision and order dated October 13, 1988, the Board granted the motion for summary judgment, held that the Company violated §§ 8(a)(1) and (a)(5) of the Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(5), and ordered the Company to bargain with the BFEA upon request. The Company then petitioned this Court for review of the Board's decision and order, and the Board cross-petitioned for enforcement.

## DISCUSSION

The Company does not dispute that it has refused to bargain with the BFEA. Nor does it dispute that an employer commits an unfair labor practice when it refuses to bargain with a union which has been properly certified as the representative of a group of the employer's employees. Rather, the Company disputes the Board's conclusion that the certification was proper.

Before examining the numerous grounds on which the Company challenges the representation proceeding, we note that in reviewing such a proceeding we ordinarily defer to the expertise and discretion of the Board. *Amalgamated Serv. & Allied Indus. Joint Bd. v. NLRB*, 815 F.2d 225, 227 (2d Cir.1987); *NLRB v. Eastern Conn. Health Servs., Inc.*, 815 F.2d 517, 518 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 140, 98 L.Ed.2d 97 (1987). Indeed, Judge Friendly wrote that, "[t]he conduct of representation elections is the very archetype of a purely administrative function, with no *quasi* about it, concerning which courts should not interfere save for the most glaring discrimination or abuse." *NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir.1970), *cert. denied*, 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237 (1971).

### A. *The Employees' Petition*

■ On December 28, 1984, approximately six months after the election, but before the certification of the BFEA, the office of Subregion 39 of the Board in Hartford, Connecticut received a written communication ("the petition"), signed by many of the Company's employees, which in relevant part read as follows:

> The undersigned employees of Bridgeport Fittings, Inc. hereby petition the Bridgeport Fittings Employee Association ("BFEA") to take the following action:
>
> 1. Notify immediately in writing Subregion 39 of the National Labor Relations Board that the Bridgeport Fittings Employee Association disclaims and waives any and all interests in representing, and any right to represent, any Bridgeport Fittings, Inc. employees, including those

currently represented by the International Brotherhood of Electrical Workers. The lawyer who forwarded the petition to the Board stated that he believed all those who signed it were members of the BFEA. In his second supplemental decision, the Director held that the petition did not prevent him from certifying the BFEA.

The Company claims that the Board abused its discretion by failing to set aside the certification in light of the petition. We find this claim to be without merit. A union normally enjoys an irrebuttable presumption of majority status for one year from the time it is certified. *NLRB v. Star Color Plate Serv.*, 843 F.2d 1507, 1508–09 (2d Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988). In case the employer has refused to bargain, the Board may extend the certification year so that it does not commence until the time the employer begins to bargain in good faith. *Id.* at 1509. The presumption of majority status normally applies even if the union in fact no longer enjoys majority support. *Id.* at 1508–09. It applies even if, after the election but before the certification, a majority of the employees in the bargaining unit inform the Board that they no longer wish to be represented by the union. *Presbyterian Homes Inc.*, 235 N.L.R.B. 408, 409 (1978).

The Company tries to avoid this clear body of law by arguing that the petition was not merely a repudiation by the employees of the BFEA but was a disclaimer by the BFEA itself of its interest in representing the bargaining unit. The Company argues that the BFEA, which lacked a constitution or by-laws, "had no existence apart from the members," and so "the power to disclaim rest[ed] solely with the majority of membership."

This argument fails. First, no evidence in the record establishes that those who signed the petition were BFEA members, let alone that they constituted a majority of the BFEA's membership. Second, we find no evidence in the record nor any legal authority to support the Company's position that any power to disclaim the BFEA's interest in representing the employees rested with the BFEA's members rather than with its elected leadership. Finally, even were we to assume *arguendo* that the signers of the petition did constitute a majority of the BFEA membership and that the BFEA membership did have the power to disclaim the BFEA's interest, these facts would have no bearing here since the members did not assert this alleged power to disclaim. The opening language of the petition reads: "The undersigned employees of Bridgeport Fittings, Inc. hereby *petition* the Bridgeport Fittings Employee Association ("BFEA") to take the following action:...." (Emphasis added.) Clearly, the petition was merely a request by the employees to the BFEA's elected leadership; it was not an announcement of disclaimer. Indeed, as shown by the BFEA's demand that the Company bargain, the petition was a request that the BFEA chose to ignore. The petition was not a disclaimer by the BFEA of its interest in representing the employees, and we conclude that it had no effect on the BFEA's status.

■ The Company also argues that the petition rendered the BFEA defunct. This argument fails as well. A union, even one which has lost all its members in the bargaining unit, is not defunct unless it is unable or unwilling to represent the employees. *Kent Corp.*, 272 N.L.R.B. 735, 735 (1984) (quoting *Hershey Chocolate Corp.*, 121 N.L.R.B. 901, 911 (1958)). Here, as evidenced by its request to the Company to bargain and its participation in proceedings before the Board, the BFEA wishes to represent the employees. Moreover, we are aware of no evidence which suggests that the BFEA would be unable to perform its duties as bargaining representative, and, hence, we conclude that the BFEA is not defunct.

■ As its final claim with regard to the petition, the Company argues that the Board acted arbitrarily in granting the General Counsel's motion for summary judgment since nearly three and one-half years had passed since the Director had certified the BFEA. In the period between the decision of the Director and the decision of the Board, the Company claims, the

bargaining unit experienced a fifty percent turnover and the BFEA was completely inactive. Therefore, the Company concludes, the Board should have conducted a hearing to determine whether the BFEA still existed.

In *Star Color Plate Service*, 843 F.2d at 1508, this Court held that an extremely long delay between the election of a union and the certification order, during which many of the employees who voted in the election left the bargaining unit, did not warrant setting aside the certification. That ruling is relevant to this case and, moreover, it appears that the inactivity on the part of the BFEA following its certification was due to the Company's refusal to bargain with it. Under *Star Color*, the passage of time and employee turnover did not justify a new factual inquiry into the case; further, setting aside the election due to the BFEA's alleged inactivity would reward the Company's refusal to bargain, and, therefore, we hold that the Board did not act arbitrarily in granting summary judgment.

## B. *Alleged Confusion and Fear Among the Employees*

The Company claims that confusion and fear among the employees tainted the election and that, in light of this taint, the Board abused its discretion by failing to set aside the election. We are not persuaded by this argument for the reasons which follow.

### 1. *Alleged Confusion*

■ In the first prong of its claim that the election was tainted, the Company argues that the employees were confused about the election. Undoubtedly, "a general atmosphere of confusion" among the employees which renders impossible a rational expression of choice may be grounds to set aside an election. *See, e.g., Al Long, Inc.*, 173 N.L.R.B. 447, 448 (1968). Here, however, we do not believe that the confusion the employees experienced, if any, justifies a determination that the Board abused its discretion by failing to set aside the election.

To establish that widespread confusion tainted the election, the Company relies primarily on the affidavits of 67 bargaining unit employees who were interviewed by Company lawyers nearly six months after the election. Many of these employees stated in their affidavits that they were confused about the purpose of the election, about which unions were competing in the election, or about the identity of the BFEA. In our view, the Board acted properly in finding that these affidavits did not justify setting aside the election. When determining whether to set aside an election, the Board's well-established practice is to look at the objective circumstances in which the election took place, rather then to rely on the subjective reactions of the employees. *Worths Stores*, 281 N.L.R.B. No. 160, 123 L.R.R.M. 1215, 1217 n. 6 (1986). When these subjective reactions are solicited by the employer and are expressed long after the election, as they were here, they are not likely to command persuasive respect. *Cf. Harlan #4 Coal Co. v. NLRB*, 490 F.2d 117, 122–23 (6th Cir.) ("[W]e are mindful of the dangers of permitting otherwise valid elections conducted by secret ballot to be set aside because some voters, after post-election introspection and in response to inquiry by their employers," file affidavits stating that their votes were tainted), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974). Hence, we decline to use the affidavits as a basis for overturning the Board's decision. Having examined the record, we do not believe that the objective circumstances of the election support the conclusion that "a general atmosphere of confusion" existed among the employees.

### 2. *Alleged Fear*

As the second prong of its argument that the election was tainted, the Company argues that the election occurred in an atmosphere of fear. Clearly, threats which generate fear among the employees may be grounds for setting aside an election. *See, e.g., Al Long*, 173 N.L.R.B. at 448. Here, however, as with the Company's claims of confusion among the employees, its claim

that the employees experienced fear fails to persuade us that the Board abused its discretion by failing to set aside the election.

To support its claim that fear tainted the election, the Company relies on several incidents. Two of these incidents can be swiftly dismissed as irrelevant. These two incidents—one involving an allegedly threatening note and the other an allegedly threatening request by a member of the BFEA to speak to an employee—occurred after the election and so "could not have had any impact on the election and, therefore, cannot constitute grounds for setting the election aside." *Scioscia,* 266 N.L.R.B. 100, 100 n. 2 (1983).

The third incident the Company relies on is a telephone call received by an employee named Anna Afonso in which an anonymous caller told her to be careful because she had two children. As the Director found in his second supplemental decision, it appears from Afonso's testimony that she received the call after the election. If so, the call could have had no impact on the election. Even if Afonso received the call before the election, there is no evidence that anyone else knew about it. In light of the fact that the BFEA won the election by 72 votes, we do not believe that a threatening call to one employee, absent evidence that others knew about it, warrants setting aside the election. The call is especially insignificant since the caller was anonymous, and therefore the call cannot be attributed to the BFEA or its supporters. *See NLRB v. Herbert Halperin Distrib. Corp.,* 826 F.2d 287, 290 (4th Cir.1987) ("Less weight is accorded the comments and conduct of third parties than to those of the ... union.").

The next incident the Company relies upon occurred in July 1984, shortly before the election. Two supporters of the BFEA, while working on the assembly line, were discussing the prospects of a four-day workweek when another employee, named Clorinda Garcia, suggested that, in the event of such a workweek, the BFEA might pay the employees for the rest of the week. In response to this remark, one of the BFEA supporters, speaking in Portuguese, told Garcia to put her "tongue in a box." According to an interpreter present at the reopened hearing, this expression means "shut up," and is considered very rude. According to Garcia, she cried for the rest of the day since no one had ever told her to shut up before.

This incident does not justify setting aside the election. Garcia testified that she did not feel threatened by the employee's statement and that she was not afraid of the BFEA supporters. The BFEA supporters' remark may have been rude, but impolite talk, without more, is insufficient to justify setting aside an election. *Cf. Linn v. United Plant Guard Workers,* 383 U.S. 53, 60–61, 86 S.Ct. 657, 661–662, 15 L.Ed.2d 582 (1966) (impolite terms such as "scab" and "liar" are commonplace in labor struggles).

Next, the Company claims that in February 1984, during a strike at the plant, several employees, including at least one who would later become a supporter of the BFEA, told another employee that if she entered the plant they would damage her car. Even assuming *arguendo* that the claim is true, it would not justify setting aside the election. The Director found, and the Company does not seem to dispute, that the alleged incident occurred, if at all, before Gonzalez filed the petition to decertify the IBEW. Conduct which occurs before the election petition is filed cannot serve as a basis for setting aside an election unless the conduct is "likely to have had a significant impact on voting." *NLRB v. Semco Printing Center, Inc.,* 721 F.2d 886, 893 n. 5 (2d Cir.1983). Here, we cannot conclude that this alleged threat to one employee would likely have had a significant effect on the voting. *See, e.g., NLRB v. Newly Weds Foods, Inc.,* 758 F.2d 4, 9–10 (1st Cir.1985) (upholding Board's conclusion that election was fair, despite testimony by an employee that he felt threatened by another employee's warning that anyone crossing picket line during a strike would be "beat up"). The potential impact of this alleged threat is especially insignificant since the threat occurred, if it did occur, even before the BFEA was formed. *See*

*Herbert Halperin*, 826 F.2d at 290 (less weight accorded to conduct of third parties).

Finally, the Company claims that at least 48 other employees experienced fear in connection with the election. However, the Company offers no evidence to support this claim. It merely argues that the Director unjustifiably failed to interview these employees, and implies that if he had interviewed them, he would have discovered evidence of fear. This argument does not help the Company's case. A party which objects to the conduct of a representation proceeding bears the burden of presenting evidence to support its objections; failure to meet this burden "is not excused because a more comprehensive investigation by the Regional Director could have turned up evidence that would have met the burden." *NLRB v. Hudson Oxygen Therapy Sales Co.*, 764 F.2d 729, 734 (9th Cir.1985).

In sum, the Company failed to provide the Board with solid evidence of even one threat which definitely occurred before the election. Faced with this lack of evidence, we do not hesitate to hold that the Board acted properly in declining to rule that fear tainted the election.

C. *Alleged Defects in the Election Ballot*

The Company claims that the election was tainted not only by confusion and fear among the employees, but also by defects in the election ballot. Like fear and confusion among the employees, defects in the election ballot may be grounds for setting aside an election. *See, e.g., Kraft, Inc.*, 273 N.L.R.B. 1484 (1985). Here, however, while the election ballot fell far short of the desired ideal, we cannot conclude that the ballot constituted a "glaring ... abuse." *Olson Bodies*, 420 F.2d at 1189.

To support its contention that the ballot was defective, the Company argues that the words on the ballots were arranged in a confusing manner, and that the Spanish, Portuguese and Laotian texts on the ballot were poor translations of the English text. Further, the Company points to the Board's failure to translate the English text into Vietnamese and Cambodian, and its failure

to provide any translation of the names of the competing unions.

The Company's first contention, that the arrangement of the words on the ballot was confusing, is without merit. Having examined the ballot, we agree with the Board that "the ballot is well organized, orderly in appearance, and not difficult to read." Nor do we believe that the ballot's Spanish, Portuguese or Laotian text provide grounds for setting aside the election. The foreign-language text on an election ballot should be understandable; it need not be flawless. *See Tanforan Park Food Purveyors Council v. NLRB*, 656 F.2d 1358, 1363 (9th Cir.1981) (Fletcher, J., concurring). Here, the Company's own expert found the Spanish translation to be "understandable" and the Portuguese translation to contain merely some minor grammatical, typographical and spelling errors. Further, the Board found that the imperfections in the Laotian portion of the ballot were not significant and that they did not confuse the three or four Laotian-speaking employees in the bargaining unit.

■ The Board's failure to offer any Vietnamese or Cambodian translation on the ballot does give us pause. The Board's failure to translate a ballot into the only languages which some of the employees in a bargaining unit can read may well prevent those employees from intelligently participating in the election. When the record shows that a significant number of employees may have been prevented from intelligently participating due to a failure to translate the ballot, or due to a critically flawed translation, the election should be set aside. *See Tanforan Park*, 656 F.2d at 1362–63 (court remands to Board to determine whether Samoan translation of ballot was so confusing as to require election to be set aside, when 13 of 27 employees in bargaining unit were Samoan); *Marriott In–Flite Servs. Div. v. NLRB*, 417 F.2d 563, 567 (5th Cir.1969) (court sets aside election because Board failed to translate ballot, when one-third of employees in unit spoke only Spanish and union won by 96 of the 562 votes cast), *cert. denied*, 397 U.S. 920, 90 S.Ct. 929, 25 L.Ed.2d 101 (1970);

see also Rattan Art Gallery, 260 N.L.R.B. 255 (1982) (improperly-translated election notice is ground for setting aside election when union won by 13 out of 37 votes and number of non-English speakers in unit was undisclosed). Here, however, it is undisputed that the bargaining unit contained only two Cambodian-speaking employees and one Vietnamese-speaking employee, and that the BFEA won the election by 72 votes. Since it is apparent that the failure to translate the ballots into Cambodian and Vietnamese did not affect the outcome of the election, we hold that the Board did not abuse its discretion in failing to set aside the election.

In support of its position, the Company relies heavily on Kraft, 273 N.L.R.B. 1484, a case in which the Board set aside an election in part because the ballot's Vietnamese and Laotian texts were flawed. We agree with the Board that Kraft is clearly distinguishable from the instant case. In Kraft, not only was the ballot poorly translated, but the layout of the ballot made it confusing to even the English-speaking employees, who comprised a majority of the unit. Id. at 1484–85. Moreover, the union won the election by only seven out of 231 votes. Id. at 1484. Here, by contrast, as far as the record discloses, the ballot presented no problems for the English-, Spanish-, and Portuguese-speaking employees, who together comprised the vast majority of the unit, and the union won the election by a wide margin.

In holding that the Board's failure to provide a Vietnamese and Cambodian translation does not require us to set aside the election, we do not mean to suggest that we condone the Board's failure to provide those translations. The Board should, of course, strive to make it possible for every eligible employee to participate intelligently in representation proceedings.

Finally, we do not believe that the Board's failure to provide any translation of the names of the competing unions warrants setting aside the election. As the Board found, certain words, such as names of unions, do not lend themselves to translation. Moreover, a vast majority of the employees spoke English, Portuguese or Spanish, languages which share the same alphabet. Therefore, almost all of the employees, even those who do not speak English, should have been able to recognize the names of the unions. Given the wide margin by which the BFEA won the election, we cannot hold that the Board abused its discretion by failing to set aside the election.

In sum, we hold that despite the deficiencies of the ballot, and the Company's allegations of fear and confusion among the employees, the evidence is insufficient to support the claim that the Board abused its discretion by failing to set aside the election.

## D. "Front" Issue

■ The Company claims that the Director denied it an adequate opportunity to prove that the BFEA was a "front" for the Teamsters, and that the Board therefore abused its discretion by failing to set aside the certification of the BFEA. We conclude that the Board did not abuse its discretion in this regard.

First of all, the Board has long held that claims that one union is fronting for another will not bar the certification of the allegedly fronting union, so long as that union is a bona fide labor organization and has participated in its own name throughout the representation process. See General Dynamics Corp., 175 N.L.R.B. 1035, 1035–36 (1969) (Board directs election despite claims of fronting, when allegedly fronting union filed representation petition, participated in hearing, and was going to have its name on election ballot); Morrison Turning Co., 83 N.L.R.B. 687, 688 (1949) (Board directs election despite claims of fronting when allegedly fronting union is a bona fide labor organization and its name appeared on authorization cards signed by employees). The rationale behind this rule is that if the allegedly fronting union wins the election, the employer will be obligated to recognize only that union and no other. See General Dynamics, 175 N.L.R.B. at 1036; Morrison Turning, 83 N.L.R.B. at 688.

Here, the Director properly found the BFEA to be a bona fide labor organization. In § 2(5), the Act defines "labor organization" as an organization in which employees participate and which exists for the purpose of dealing with the employer about conditions of work. 29 U.S.C. § 152(5) (1982). Clearly, the BFEA is an organization in which employees participate; it held meetings for employees and has collected voluntary contributions. It is also an organization which exists to deal with the employer, as shown by its requests for the Company to bargain. The fact that the BFEA had not yet adopted a constitution and by-laws or collected dues does not affect its status as a labor organization. *See Sahara Datsun, Inc. v. NLRB*, 811 F.2d 1317, 1320 (9th Cir.1987). Not only has the BFEA been found to be a bona fide labor organization, but it has been found to have consistently appeared in its own name during the representation proceeding. Also, its name, and not the Teamsters', appeared on the election ballot. We find no reason to disturb these findings. Since the BFEA is a bona fide labor organization and appeared in its own name during the representation proceeding, we hold that the Company's allegations that the BFEA was a front are not a proper ground on which to set aside the election.

Moreover, we do not believe that the Company was denied an adequate opportunity to attempt to establish that the BFEA was a front for the Teamsters. At the reopened hearing, the Company had the opportunity to present, and did present, evidence by which it hoped to prove that the BFEA intended to cede its certification to the Teamsters. The Director found this evidence, which was strongly contested, insufficient to establish that the BFEA intended to abandon its bargaining rights. Now, to support its claim that it was denied an opportunity to present evidence on the fronting issue, the Company points to the exclusion from evidence of a letter written by the president of the Teamsters to Local 1040. The Teamsters president's letter would not have established that the BFEA was a front. In the letter, the Teamsters president states that he does not believe

the BFEA is "a creation of Local 1040" and that "Local 1040 will not be permitted to represent Bridgeport Fittings employees now or in the future." This letter, if it has any probative value at all, belies the Company's claim that the BFEA is a front for the Teamsters.

The Company also claims that it was denied the chance to discover evidence which, if found, would allegedly have proven that the Teamsters provided the BFEA with financial assistance and other aid. Evidence showing that the BFEA received aid from the Teamsters would not have demonstrated that the BFEA was a front. The fact that one union assists another in various ways does not make the assisted union a front for the union which provided the assistance. *See Magic Pan, Inc. v. NLRB*, 627 F.2d 105, 109–10 (7th Cir.1980); *Morrison Turning*, 83 N.L.R.B. at 689. In sum, we conclude that on this issue, as with the others, the Company has failed to establish that the Board abused its discretion by certifying the BFEA.

### CONCLUSION

For the foregoing reasons, the petition for review is DENIED and the Board's order is hereby ENFORCED.