**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PRECISE CASTINGS, INC., Respondent.**

No. 89–3560.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1990.

Decided Oct. 17, 1990.

Aileen A. Armstrong, Elliott Moore, Paul Hitterman, N.L.R.B., Washington, D.C.,

Herbert V. Adams, III, Elizabeth Kinney, Linda McCormick, N.L.R.B., Chicago, Ill., Peter D. Winkler, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., Donald J. Crawford, N.L.R.B., Chicago, Ill., for petitioner.

Charles W. Pautsch, Wessels & Pautsch, Milwaukee, Wis., for respondent.

Before WOOD, Jr., and EASTERBROOK, Circuit Judges, and GRANT, Senior District Judge.*

EASTERBROOK, Circuit Judge.

Must the National Labor Relations Board print ballots in all languages used in the workplace? Unless the answer is "yes" in every case, we must enforce the Board's order requiring Precise Castings, Inc., to bargain with Local 18–B of the Electronic, Electrical, Salaried, Machine and Furniture Workers union. This union won an election at Precise Castings by a vote of 18 to 13, with 2 spoiled ballots and 3 challenged votes. The ballots were in English. Ten of the 41 employees eligible to vote read and speak only Spanish. None of them has complained to the Board, and Precise Castings did not introduce evidence suggesting that even one of its Spanish-speaking employees was confused. Unless we create a *per se* rule that the Board must print ballots in the languages preferred by the employees, there is no reason to deny effect to its order in this case.

The National Labor Relations Act guarantees a free choice of representative (or no representative). 29 U.S.C. § 157. Elections allow the employees to express their choice. Precise Castings argues that ballots in an unreadable language may prevent the employees from expressing that choice accurately. Although Spanish-speaking persons living in the United States undoubtedly know that "yes" means "si" and that "no" has the same meaning in both languages, they may not know what question is being asked, that "yes" expresses a preference for a particular union, as opposed to the status quo. Only a multilingual ballot assures the "laboratory conditions" necessary to effective choice, Precise Castings submits, with support from *Marriott In–Flite Services v. NLRB*, 417 F.2d 563 (5th Cir.1969). Contra, *NLRB v. Lowell Corrugated Container Corp.*, 431 F.2d 1196 (1st Cir.1970).

The fifth circuit found two defects in the use of English ballots when a third of the voters were literate only in Spanish. First, the court believed, the election departed from the Board's policy of using bilingual ballots; second, the court thought that elections using ballots printed in a language employees cannot understand are unfair. 417 F.2d at 567. The first of these need not detain us. Since *Marriott* the Board has made it clear that it has no policy requiring the use of ballots in multiple languages. *Northwest Products, Inc.*, 226 N.L.R.B. 653 (1976). The last vestige of that policy, if the Board ever had one (it denied having one at the time of *Marriott*, and *Lowell* concluded that it had none), was a statement in the General Counsel's practice manual that if a regional director deems election notices in multiple languages appropriate, the director also should print ballots in those languages. *Casehandling Manual* pt. 2 § 11314 (1984) ("If a foreign language notice is used, that language must also be used on the ballot."). The current version of the *Manual* § 11314 (1989) changes this to: "If a foreign language notice is used that language may also be used on the ballot."

*Marriott*'s second and principal conclusion is that when many voters have "no access to ballots in language [they] can understand [the election] necessarily falls below the minimum laboratory standards of fairness.... [I]t would be whimsical to establish meticulous safeguards against coercion, misinformation, and corruption if a sizeable portion of the electorate, though untrammeled in its choice, does not know how to exercise it." 417 F.2d at 567 (footnotes omitted). When the fifth circuit wrote this in 1969, the Board required elections to take place in "laboratory conditions", free from the distortions common in political contests. *Hollywood Ceramics*

---

* Hon. Robert A. Grant, of the Northern District of Indiana, sitting by designation.

*Co.,* 140 N.L.R.B. 221 (1962); *Gummed Products Co.,* 112 N.L.R.B. 1092 (1955). This doctrine was based in part on a belief that labor elections should be "better" than political ones, and in part on a belief that employees were easily misled and incapable of expressing their true choice except in "laboratory conditions". Since 1969 there has been a revolution in the Board's thought. Partly in response to research showing that employees were considerably more capable, and threats or propaganda less effective than the Board had believed, see Julius G. Getman, Stephen B. Goldberg & Jeanne B. Herman, *Union Representation Elections: Law and Reality* (1976), the Board overruled *Hollywood Ceramics. Shopping Kart Food Market, Inc.,* 228 N.L.R.B. 1311 (1977), overruled by *General Knit of California, Inc.,* 239 N.L.R.B. 619 (1978), overruled by *Midland National Life Insurance Co.,* 263 N.L.R.B. 127 (1982). Today the Board is much more likely than in 1969 to believe that employees can fend for themselves. It has pulled the rug out from under *Marriott.* The Board no longer establishes "meticulous safeguards" for elections, so it cannot be "whimsical" to assume that employees can cast accurate votes despite the fact that the ballot is in English. Questionable, perhaps; whimsical, no.

Following the lead of *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946), we have held repeatedly that the Board possesses discretion to set the rules for conducting elections and to determine what procedures suffice to protect the employees' right to choose. E.g., *NLRB v. Lovejoy Industries, Inc.,* 904 F.2d 397, 402 (7th Cir.1990); *Mosey Manufacturing Co. v. NLRB,* 701 F.2d 610, 615 (7th Cir.1983) (in banc). Cf. *NLRB v. Curtin Matheson Scientific, Inc.,* —— U.S. ——, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990); *NLRB v. Bufco Corp.,* 899 F.2d 608, 610–11 (7th Cir.1990); *Communication Workers v. NLRB,* 784 F.2d 847, 849 (7th Cir.1986). Making labor elections more like political elections is among the Board's legitimate choices. And most ballots in political elections are in English. True, the Voting Rights Act has, since an amendment in

1975, 42 U.S.C. § 1973aa–1a(b), required covered jurisdictions to offer ballots in languages used by 5% of the populace, if those groups are below the national norm in literacy. In the main, however, persons who do not speak English must learn from other sources how to cast an effective vote. See also *Puerto Rican Organization for Political Action v. Kusper,* 490 F.2d 575 (7th Cir.1973) (a covered jurisdiction could comply with the version of the Voting Rights Act then in force by providing directions in Spanish without necessarily printing the ballots in Spanish).

Voting for one's choice is the least worry of a person who does not speak English. How is this person to *choose*? The campaign is in English, the principal media are in English. Anyone who aspires to informed preferences must read newspapers in other languages, discuss the subject with friends who can follow the campaign in English, and so on. A person with the ability to make an intelligent choice is likely to have the resources to express this choice at the polls. This is so of labor elections no less than of political elections. When a significant fraction of the employees neither speak nor read English, both the union and the employer will campaign to the employees in their own language. Seeking support, both union and employer will seek to persuade; seeking to translate support into victory, both union and employer will inform employees how to express their choice. So although the ballot appears only in English, and the employee therefore cannot read the question being asked, neither union nor employer will leave the employee in doubt. The union will tell the workers (in their own tongues) to check the "yes" box if they favor it; the employer will ask them to tick "no". Such employees need not read the ballot, any more than English-speaking employees do. Consider illiterate employees: both union and employer ensure that persons who cannot read in *any* language are nonetheless equipped to express a choice. If illiterate employees may choose on English ballots, then employees literate in Spanish may do the same.

The Board does not leave the workers to learn from the election campaign alone. On request of either employer or union, the Board posts elaborate election notices in all languages the workers speak or read. Each notice covers three 8½ × 11 sheets of paper. These notices describe eligibility to vote and the conduct of the election. They include sample ballots, specific to the union and employer. The question on the Board's official ballot is: "Do you wish to be represented for purposes of collective bargaining by [name of union]. Mark an 'X' in the square of your choice". The sample ballot on the Spanish notice is written entirely in Spanish, so that the employees can see the question exactly: "¿Desea usted estar representado para los fines de negociar colectivamente por [name of union]. Marquese con una 'X' dentro del cuadro de su seleccion". "Muestra" ("sample") is emblazoned on the ballot. Immediately above is the advice: "La papeleta reproducida en el presente aviso esta redactada en español y es traducción correcta de la papeleta que Ud. recibirá en la elección, pero la cual estará impresa en ingles." So the Board tells the employees that this is an accurate translation, but that the ballot at the election will be printed in English. Anyone who takes the trouble to read the notice will be equipped to vote accurately.

As the fifth circuit observes, "[n]otices are not always read." *Marriott*, 417 F.2d at 567. Precise Castings adds that notices may be half-read: an employee may read the "muestra" and think that the ballot will be in Spanish, without reading the complete statement immediately above. Although both of these are true, one could go on. Ballots also are not always read. The number of spoiled or invalid ballots attests to this. Campaigns are not always followed. The clearest ballot in the world will do nothing for an employee who has given the subject no thought and does not know whether the union will be beneficial or detrimental. If we treat employees as children, unable to protect their own interests, then recognition that employees may not read (or may read only part of) the notices may be significant. The Board has abandoned that view of the workers, however, and we have sustained its decision to credit their ability to make intelligent choices even in the face of misleading propaganda. If employees have that ability, they can figure out how to vote using the Board's election notices.

Giving employees this much credit is within the Board's power. It may concentrate (as it does) on giving them a reasonable *opportunity* to vote intelligently, without taking all possible steps to ensure that they do so. Especially when the other options have problems of their own. One is to print ballots in each language any employee uses. Such ballots would be intelligible, but there might be so few in any given language that union or employer could link a vote to a given voter, breaching the confidentiality of the polling place. The second option is to put all of the languages on every ballot. That would work well with two languages, less well as the number of languages increases—and as the ballot must include languages that cannot be expressed in the Roman alphabet. For example, the ballot in *Bridgeport Fittings, Inc. v. NLRB*, 877 F.2d 180, 187 (2d Cir. 1989), was printed in English, Spanish, and Portuguese, with Laotian added by hand because the Board cannot produce the necessary characters. The employer attacked this ballot on the ground that the translations were poor, that the handwritten scrawl on the ballots was confusing, and (inconsistently) that the Board had not *also* handwritten the question in Vietnamese and Cambodian. See also, e.g., *Rattan Art Gallery, Ltd.*, 260 N.L.R.B. 255 (1982) (English–Ilocano ballot), and *Kraft, Inc.*, 273 N.L.R.B. 1484 (1985) (ballot printed in English and Spanish, with handlettering in Vietnamese and Laotian), both setting aside elections because of poor translation on the ballot; *Tanforan Park Food Purveyors Council v. NLRB*, 656 F.2d 1358, 1362–63 (9th Cir.1981) (remanding so that the Board could consider whether Samoan instructions on ballot were confusing). Election notices may be written by native speakers of the language and printed in the proper characters, avoiding clutter and mistranslation. The result will be imperfect,

**1164**

as *Marriott* and Precise Castings emphasize, but we live in an imperfect world. Striving for perfection makes elections more difficult to conduct, and cases such as *Tanforan* and *Marriott* demonstrate that the search has its own costs. Rerunning elections, or litigating about their validity, may frustrate indefinitely the implementation of the employees' legitimate selection. Choosing how much imperfection to accept is for the Board. See *Lovejoy Industries.*

One final contention requires comment. Precise Castings observes that the Board has not established a national policy but has left to its regional directors the choice among multi-lingual ballots, ballots in different languages, and English ballots plus election notices in other languages. If its plant were located in Connecticut, the employer says, the ballots would have been bilingual; because it is located in Wisconsin (part of the Board's Region 13), its employees received English ballots. Region 13 is in the minority; most of the others use multi-lingual ballots some if not all of the time, while Region 13 never uses them. Disparities of this kind are familiar to those who deal with the United States Attorneys, 94 semi-autonomous prosecutors who exercise considerable freedom in establishing policy. Nothing in the National Labor Relations Act prevents the Board from giving its subordinates discretion in matters of this kind. One of the objections to the Board's old "laboratory conditions" doctrine was that it never allowed enough differences to learn anything about the need for or effects of its rules. When the regions follow different paths, the Board can evaluate the results and may conclude that one is preferable—or that the costs and benefits of the competing options are so closely balanced that uniformity is unnecessary. So far the Board is of the latter view about the use of multi-lingual ballots. We lack grounds on which to upset its position, when the record contains no evidence of actual confusion.

ENFORCED.