**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ARTHUR SARNOW CANDY CO., INC. and Lily Popcorn, Inc., Respondents.**

No. 1922, Docket 94–4030.

United States Court of Appeals, Second Circuit.

Argued June 28, 1994.

Decided Nov. 10, 1994.

Margaret Luke, N.L.R.B., Washington, DC (Frederick L. Feinstein, Gen. Counsel, Linda Sher, Acting Associate Gen. Counsel,

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Peter Winkler, Supervisory Atty., N.L.R.B., of counsel), for petitioner.

Jeffrey Pollack, New York City (Horowitz & Pollack, P.C., of counsel), for respondents.

Before: KEARSE and ALTIMARI, Circuit Judges, and SEYBERT, District Judge.*

SEYBERT, District Judge:

## OVERVIEW

On August 21, 1992, Local 719, International Brotherhood of Teamsters, AFL–CIO ("the Union") was elected as the representative of certain employees of Arthur Sarnow Candy Co., Inc. and Lily Popcorn, Inc. (together, "the Company"),[1] despite attempts by the Company to block the election. On September 25, 1992, the National Labor Relations Board ("NLRB" or "Board") certified the Union as the employees' representative over the Company's objections. The Company then refused to bargain with the Union. On September 30, 1993, the Board found that the refusal to bargain constituted an unfair labor practice and ordered the Company, *inter alia,* to bargain with the Union.

The Board petitions the Court under § 10(e) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(e) (1988), for enforcement of its order dated September 30, 1993. The Company argues that the order should not be enforced because the Union's election was barred by an existing collective bargaining agreement and the Board had failed to supply appropriate foreign language interpreters during the election.

For the reasons below, we grant enforcement of the Board's order.

## BACKGROUND

On March 26, 1992, the Union filed a representation petition with the Board, seeking an election by the Company's full-time and regular part-time warehouse and production employees and drivers at its location in West Hempstead, New York ("the Employees") to determine whether the Union should be certified as the Employees' collective bargaining representative. The Company and the United Crafts and Industrial Workers Union, Local 91 ("Local 91"), sought to block the election, contending that it was barred by an existing collective bargaining agreement between Local 91 and the Company (the "Local 91 Agreement"). In support of their claim, the Company and Local 91 submitted various versions of the Local 91 Agreement to the Board's regional director.

After reviewing testimony from and documents submitted in a hearing before an NLRB hearing officer held on April 14, 1992, the NLRB's regional director concluded on July 2, 1992, *inter alia,* that the versions of the Local 91 Agreement he reviewed failed to set forth the terms of a collective bargaining agreement with sufficient clarity to bar an election. The regional director also found that the election could not be barred because the Local 91 Agreement contained illegal "union security"[2] and "members-only"[3] clauses. The regional director then directed that the election take place. On August 20, 1992, the NLRB declined to review the regional director's decision.

In preparing for the election, the parties agreed that election notices and ballots would

---

* Honorable Joanna Seybert, United States District Court for the Eastern District of New York, sitting by designation.

1. In the proceedings below, Arthur Sarnow Candy Co., Inc. and Lily Popcorn, Inc. were found to be a single-integrated business enterprise. *Arthur Sarnow Candy Co.,* 312 NLRB No. 126 at 1, 1993 WL 398428 (September 30, 1993).

2. A union security clause in a collective bargaining agreement typically requires employees to be union members and to pay union dues and initiation fees. *Paragon Prod. Corp.,* 134 NLRB 662, 663 & 666 (1961). The NLRB considers certain union security clauses to be illegal and will ordinarily find no contract bar if a collective bargaining agreement contains such an illegal clause. *Id.* at 666–7.

3. A "members-only" clause in a collective bargaining agreement typically gives to union members benefits that are unavailable to employees who are eligible to be, but are not, union members. *Radio Frequency Connectors Corp.,* 126 NLRB 1076, 1077 (1960) (citations omitted). The NLRB generally finds such clauses to be illegal. *Id.*

be printed in English, Spanish, Portuguese and Haitian–Creole. The Company and Local 91 requested that Spanish, Portuguese and Haitian–Creole interpreters be made available during the election. The Company supplied a list of the eligible voters on its payroll from which the regional office determined, by examination of last names, that four or five voters appeared to be of French origin and nine of Hispanic origin. On July 28, 1992, the regional office indicated that it would provide Spanish and Portuguese interpreters but not one that spoke Haitian–Creole. On August 6, the Company protested in writing the decision not to provide an Haitian–Creole interpreter. On August 13, the regional office informed the Company that it would only be able to furnish a Spanish interpreter. In a letter sent by facsimile to the regional office on the same day, the Company protested this decision not to supply the Portuguese interpreter and continued to request that an Haitian–Creole interpreter be made available. The Company's letter specifically noted that some members of the voter population were not bilingual but said nothing about any Employees being unable to read or write in their native language.

The Union won a majority of the votes in a secret-ballot election held on August 21, 1992. A Spanish interpreter, a Portuguese interpreter and a Board official were present at the election. The tally of ballots showed 10 votes cast for the Union, 7 votes cast for Local 91 and 1 vote cast against representation. One additional ballot was challenged, and one ballot was found void because the voter had checked off all three boxes on the ballot and written "yes" at the top thereof. As a majority of votes cast was necessary for the election of the Union, 29 U.S.C. § 159(c)(3) (1988), the voided ballot would have been determinative of the election had the ballot been cast for Local 91 or against representation.

The Company objected to the election, arguing that the NLRB failed to supply an interpreter in the Haitian–Creole language and to notify the Company on a timely basis that a Portuguese interpreter would be present. The Company claimed that its employees had the impression that no Portuguese interpreter would be present. On September 25, 1992, the NLRB's regional director overruled these objections, noting that the Board did supply a Portuguese interpreter and that the Company had failed to provide any evidence either before or after the election, other than its August 6 and August 13, 1992 letters to the regional office, that an Haitian–Creole interpreter was necessary. The regional director then certified the Union as the Employees' exclusive collective bargaining representative.

On July 8, 1993, the NLRB denied the Company's request for further review of the regional director's certification. The NLRB adopted the regional director's rationale for not invalidating the election. It also found that no evidence had been presented indicating "that the electorate was confused by the voting procedures or unable to make an informed choice in the election." *Arthur Sarnow Candy Co.*, 311 NLRB 1137, 1137 n. 1, 1993 WL 257402 (1993).

■ The Company subsequently refused to respond to a letter from the Union dated October 1, 1992 requesting bargaining and information in the Company's possession relating to the bargaining unit that the Union represented. In response, the Union filed an unfair labor practice charge. The NLRB's General Counsel then issued a complaint alleging that the Company's refusal to bargain constituted a violation of the Act. On September 30, 1993, the NLRB granted a summary judgment motion made by the General Counsel, finding that the issues raised by the Company "were or could have been litigated in the prior representation proceeding" and that the Company had not offered "any newly discovered and previously unavailable evidence."[4] The NLRB found that the Company's conduct was wrongful and ordered the Company to cease and desist from refusing to bargain with the Union and from "interfering with, restraining, or coercing employ-

---

4. *Arthur Sarnow Candy Co.*, 312 NLRB No. 126 at 1. Generally, a matter litigated in a representation proceeding will not be reheard in a related unfair labor practice proceeding before the Board unless newly discovered or previously unavailable evidence is presented. 29 C.F.R. § 102.67(f) (1993); *NLRB v. Bayliss Trucking Corp.*, 432 F.2d 1025, 1028 n. 5 (2d Cir.1970).

ees" in the exercise of their statutory rights. *Arthur Sarnow Candy Co.*, 312 NLRB No. 126 at 2. The order also directed the Company, *inter alia*, to bargain with the Union upon request and to post a remedial notice. *Id.* The NLRB now applies for enforcement of its order. The Company requests that the Court set aside the election or, alternatively, order a new election.[5]

### DISCUSSION

In its petition, the Board claims that its certification of the Union as the Employees' collective bargaining representative was reasonable and should be upheld. The Company challenges the certification, asserting that the election was barred by the existing Local 91 Agreement. The Company also argues that the election was unfair because no Haitian–Creole interpreter was provided and the Company was not notified in advance that a Portuguese interpreter would be present. For the reasons discussed below, the Court finds that the Board acted within the scope of its discretion in certifying the Union as the Employees' collective bargaining representative.

■ In reviewing representation elections, this Court has stated that "[t]he conduct of representation elections is the very archetype of a purely administrative function, with no *quasi* about it, concerning which courts should not interfere save for the most glaring discrimination or abuse." *NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir. 1970), *cert. denied*, 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237 (1971); *see also Bridgeport Fittings, Inc. v. NLRB*, 877 F.2d 180, 183 (2d Cir.1989) ("[I]n reviewing such a [representation] proceeding we ordinarily defer to the expertise and discretion of the Board."); *Amalgamated Serv. & Allied Indus. Joint Bd. v. NLRB*, 815 F.2d 225, 227 (2d Cir.1987) (quoting *Olson Bodies*, 420 F.2d at 1189, for the same proposition); *NLRB v. Newton–New Haven Co.*, 506 F.2d 1035, 1037 (2d

Cir.1974) (acknowledging the "broad latitude" entrusted to the Board in the conduct of representation elections); *Local 1545, United Bhd. of Carpenters & Joiners of America v. Vincent ex rel. NLRB*, 286 F.2d 127, 130–31 (2d Cir.1960) (indicating that the NLRB's discretion with respect to representation elections includes determining whether an election may proceed irrespective of an existing collective bargaining agreement). Accordingly, "when reviewing a request to overturn a Board decision refusing to set aside an election, we are limited to the narrow question of whether the Board abused its discretion in certifying the election." *Rochester Joint Bd., Amalgamated Clothing & Textile Workers Union v. NLRB*, 896 F.2d 24, 27 (2d Cir.1990).

■ The party objecting to an election bears the burden of presenting evidence demonstrating that the Board abused its discretion in certifying the election. *See, e.g., NLRB v. Mattison Mach. Works*, 365 U.S. 123, 123–24, 81 S.Ct. 434, 435, 5 L.Ed.2d 455 (1961) (per curiam); *NLRB v. Black Bull Carting Inc.*, 29 F.3d 44, 46 (2d Cir.1994) (per curiam) ("A party seeking to overturn an election on the ground of a procedural irregularity has a heavy burden."); *Newton–New Haven Co.*, 506 F.2d at 1036; *Polymers, Inc. v. NLRB*, 414 F.2d 999, 1004 (2d Cir. 1969) (also noting, in a case involving possible tampering with a ballot box, that "[t]he burden of setting aside an election is a heavy one and falls upon the party attacking it"), *cert. denied*, 396 U.S. 1010, 90 S.Ct. 570, 24 L.Ed.2d 502 (1970). Moreover, in reviewing an election certification, the Court is to view the NLRB's factual findings as conclusive unless they are not supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Lipman Motors*, 451 F.2d at 827, n. 8 (citations omitted).

### I. *Contract Bar*

■ The Company first argues that the election was precluded by the "contract bar"

---

5. In order to obtain judicial review of a NLRB order certifying a statutory bargaining representative, a company must invite an unfair labor practice charge by refusing to bargain. *See, e.g., NLRB v. Long Island College Hosp.*, 20 F.3d 76, 78 n. 2 (2d Cir.1994) (noting that, in contrast to

unfair labor practice orders, NLRB representation determinations are not "final orders" judicially reviewable under § 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f)); *Lipman Motors, Inc. v. NLRB*, 451 F.2d 823, 825 n. 3 (2d Cir.1971).

rule. Under this rule, if an employer and a union have entered into a collective bargaining agreement, the agreement constitutes a bar to the holding of a representation election for the life of the agreement, up to a maximum of three years. *See NLRB v. Burns Int'l Sec. Serv., Inc.*, 406 U.S. 272, 290 and n. 12, 92 S.Ct. 1571, 1583–84 and n. 12, 32 L.Ed.2d 61 (1972) (acknowledging the existence of the "contract bar" rule); *Bayliss Trucking Corp.*, 432 F.2d at 1027 n. 3; *Maramont Corp.*, 1994 NLRB LEXIS 286, at *26 (April 28, 1994). "The NLRB's contract bar rule is intended to stabilize for a reasonable term an existing contractual relationship between an employer and its employees' bargaining representative." *Corallo v. Merrick Cent. Carburetor, Inc.*, 733 F.2d 248, 252 (2d Cir.1984). Because a contract bar prevents employees from freely choosing representation over a specified period, the NLRB has required that the documents claimed to constitute a contract bar "must clearly set out the terms of the agreement and must leave no doubt that they amount to an offer and an acceptance of those terms." *B.C. Acquisitions, Inc.*, 307 NLRB 239, 239, 1992 WL 87488 (1992); *see also Appalachian Shale Products Co.*, 121 NLRB 1160, 1163 (1958) (stating that in order to find a contract bar, "a collective bargaining agreement must contain substantial terms and conditions of employment deemed sufficient to stabilize the bargaining relationship").

■ According to the record below, prior to and during the April 1992 hearing, the Company and Local 91 submitted numerous versions of the Local 91 Agreement. The first version that the Company submitted to the NLRB's regional office on April 1, 1992 was signed only by Local 91 and consisted of only the first and last pages. The second version which the Company submitted to the NLRB's regional office one week later on April 7, 1992 was complete but contained handwritten corrections, some of which were initialed by the Company and none of which had been initialed by the Union. Even though the Company had initialed only *some* of the comments on the April 7 version, the Company's transmittal letter to Local 91

written at the time the agreement was being negotiated states, "[y]ou will note that there are a number of inked corrections thereon *all* of which have been initialed." (Jt. Appendix at 173a (emphasis added).) On the next day, the Company provided the NLRB's regional office with yet another version of the Local 91 Agreement.[6] On April 7, Local 91 also had submitted a version of the Local 91 Agreement to the regional office.

At the hearing, the Company and Local 91 submitted to the hearing officer yet another version of the Local 91 Agreement. This version contained handwritten modifications additional to those on the preceding versions. Again, it was unclear whether both the Company and Local 91 had agreed to the revisions; some revisions were initialed by both Local 91's business manager and a Company representative, some by only one party and some by neither party. The comments "OK" or "N.G. See me" accompanied certain modifications. Despite the differences among the various versions of the Local 91 Agreement, each version had the same signature page.

Many of the modifications affected key terms of the Local 91 Agreement. Revisions not initialed by both sides or that had questions raised next to them pertained to part-time workers' entitlement to vacation, the number of vacation days to which workers were entitled and hiring rates. A handwritten change not initialed by either party purported to give workers a 25 cent per hour raise effective January 26, 1992. In addition, in contrast to the versions of the Local 91 Agreement submitted to the regional office prior to the hearing, the version submitted at the hearing contains no information on the length of paid vacations taken prior to January 26, 1991, as the original typed information and subsequent handwritten information relating to pre-January 1991 vacations was crossed out.

The termination date of the Local 91 Agreement was also ambiguous. As typed, the Local 91 Agreement appeared to expire on January 25, 1992. In the version submitted into evidence at the hearing and in all but the first versions submitted prior to the

---

6. A copy of this version is not included in the appendices submitted by the parties to the Court.

hearing, however, the "2" in 1992 was crossed out and a "3" had been inserted, indicating that the expiration date was January 25, 1993. This modification is critical because the election took place on August 20, 1992; if the contract expired on January 25, 1992, there would be no contract bar.

The Company has provided no evidence that a Local 91 official agreed in writing to this or any of the other handwritten alterations. In his testimony before the NLRB's hearing officer, Vincent Giannini, Local 91's business representative, stated that the Union's president signed the Local 91 Agreement before the Union and the Company negotiated the handwritten modifications. Giannini testified that he did not participate in the actual negotiation of the handwritten modifications but that he recalled the parties agreeing on the modifications and the Company signing the Local 91 Agreement. At no point did Giannini indicate that Local 91 agreed in writing to any of the modifications.

Given the varying versions of the Local 91 Agreement, the confusing handwritten modifications made to key terms and the absence of written assent thereto by both the Company and Local 91, the Board's conclusion that the Local 91 Agreement did not set forth an understanding between the Company and Local 91 is clearly supported by substantial evidence.

■ The Company argues in its brief that even if the NLRB's regional director found the terms of the Local 91 Agreement to be ambiguous, the NLRB should have remanded the case for a further hearing rather than find no contract bar. The Company claims that the problem of ambiguity is due solely to the hearing officer's failure fully to develop the record. The Company insists that any issues regarding the Local 91 Agreement could have been resolved through a further hearing. This argument is not compelling. The Company had the burden of proving to the hearing officer below that an agreement on material points had been reached. If, as the Company now asserts, it could have explained some of the factual issues raised by

the NLRB, the time to have done so was at the hearing. The record indicates that the hearing officer inquired about the handwritten changes during the hearing, stating that they were "not the clearest in the world. And I'd like to take you through them so you can identify them for us, okay." (Jt. Appendix at 122a–123a.) The Company cannot therefore claim to have been unaware that the information it had provided to the hearing officer was incomplete and unclear. Nor has the Company proffered any justifiable reason for its failure to furnish more precise information during the hearing below. The NLRB decision not to remand the case for a further hearing, therefore, was perfectly reasonable under the circumstances.

Moreover, the NLRB's ruling of no contract bar is consistent with the NLRB's practice in addressing collective bargaining agreements that fail to set forth material terms. *See, e.g., Roosevelt Memorial Park, Inc.,* 187 NLRB 517, 517–18 (1970) (stating that the party asserting contract bar "bears the burden of proof that the contract was fully executed, signed and dated prior to the filing of the petition ...."); *Union Fish Co.,* 156 NLRB 187, 191–92 (1965) (stating that an agreement will not serve as a bar if parol evidence is needed to establish its terms); *B.C. Acquisitions,* 307 NLRB at 239, 240 n. 4 (stating that the parties' belief that they have a properly concluded agreement will not cure the defect of ambiguity). The NLRB clearly acted within the scope of its discretion in finding no contract bar and in directing that a representation election take place.[7]

II. *The Provision of Foreign Language Interpreters*

■ The Company's second argument is that even if the election were not barred, it should be overturned because of the NLRB's failure to provide appropriate interpreters. This argument also is without merit. To justify the setting aside of an election, "the challenger must come forward with evidence of actual prejudice resulting from the challenged circumstances." *Black Bull Carting,*

---

7. As the NLRB's ruling of no contract bar based on the ambiguous terms of the Local 91 Agreement was appropriate, the Court need not ad-

dress the other grounds contained in the record below for finding no contract bar.

29 F.3d at 46 (citing *Mattison Mach. Works,* 365 U.S. at 124, 81 S.Ct. at 435); *see, e.g., Mattison Mach. Works,* 365 U.S. at 124, 81 S.Ct. at 435 (requiring showing of "prejudice to the fairness of the election"). It is not enough to show "merely a possibility that the election was unfair." *Black Bull Carting,* 29 F.3d at 46 (citations and internal quotations omitted); *see also Bayliss Trucking Corp.,* 432 F.2d at 1029 ("But more than the theoretical possibility of a tainted result must be established before we will overturn the Board's conclusion...").

■ The Company argues that because the election deviated from "laboratory conditions," it should be invalidated. *See General Shoe Corp.,* 77 NLRB 124, 127 (1948), *enforced,* 192 F.2d 504 (6th Cir.1951), *cert. denied,* 343 U.S. 904, 72 S.Ct. 635, 96 L.Ed. 1323 (1952). Previously, in *Amalgamated Services,* 815 F.2d at 227, the Court noted that:

> The idea of laboratory conditions is a useful guide for measuring the conduct of an election. However, it is probably not possible to completely achieve such ideal conditions, and elections will not automatically be voided whenever they fall short of that standard. Rather, the idea of laboratory conditions must be realistically applied. The Board has broad discretion to determine whether the circumstances of an election come sufficiently close to laboratory conditions so that employees can exercise free choice in deciding whether to select [a union] as their representative.

*See also NLRB v. Precise Castings, Inc.,* 915 F.2d 1160, 1164 (7th Cir.1990) (noting in deciding not to apply a strict "laboratory conditions" standard that "[s]triving for perfection makes elections more difficult to conduct ... Rerunning elections, or litigating about their validity, may frustrate indefinitely the implementation of the employees' legitimate selection"), *cert. denied,* 499 U.S. 959, 111 S.Ct. 1581, 113 L.Ed.2d 646 (1991); *see also NLRB v. McCarty Farms, Inc.,* 24 F.3d 725, 728 n. 2 (5th Cir.1994) ("Although we apply the 'laboratory conditions' test, 'we recognize that clinical asepsis is an unattainable goal in the real world of union organizational efforts.' *NLRB v. Sumter Plywood Corp.,* 535 F.2d 917, 920 (5th Cir.1976) [, *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538 (1977) ]. Accordingly, we are conscious of the 'realities of industrial life' in our application of the controlling standard. *Exeter 1–A Ltd. Partnership v. NLRB,* 596 F.2d 1280, 1283 (5th Cir.1979) (quoting *Morganton Full Fashioned Hosiery,* 107 NLRB 1534, 1538 (1954))."). The Court continues to adhere to the view that application of an inflexible "laboratory conditions" standard would not be productive, as representation elections simply do not take place in the controlled setting of the laboratory but in the ordinary workplace and within the confines of limited resources. Thus, as the Court noted in *Amalgamated Services,* 815 F.2d at 227, the "laboratory conditions" standard must be practically applied.

■ Viewing the "laboratory conditions" standard in this light, the NLRB did not abuse its discretion in certifying the election despite the NLRB's failure to provide an Haitian–Creole interpreter. The record contains no indication that any Employees that spoke only Haitian–Creole could not read or write in that language. Given the absence of such evidence, the Board's regional office reasonably concluded that the distribution of the multilingual ballots and election notices in Haitian–Creole, Portuguese and Spanish would suffice to meet the Haitian Employees' language needs. *Cf. King's River Pine,* 227 NLRB 299, 299, 1976 WL 7651 (1976) (holding that the absence of bilingual ballots was not a sufficient grounds for setting aside an election where the employer failed to present evidence that a substantial number of Spanish surnamed employees could not read or understand English); *St. Elizabeth Hosp. v. NLRB,* 715 F.2d 1193, 1199 (7th Cir.1983) (the employer presented evidence that two or more employees were illiterate and therefore unable to read the election notice and, based on that evidence, the court remanded for further development of the factual record to determine whether the employees had difficulty making an informed choice).

The ballot was not so complex as to require an Haitian–Creole interpreter for any Employees that may not have been fully literate. The instructions on the ballot were

in fact simple: "[t]his ballot is to determine the collective bargaining representative, if any, for the unit in which you are employed. Mark an "X" in the square of your choice. DO NOT SIGN THIS BALLOT. Fold and drop in the ballot box. If you spoil this ballot, return it to the Board Agent for a new one." Indeed, the Company has offered no evidence that any Haitian–Creole speakers in fact were unable to understand the election notices and ballots.

The Company argues that because one ballot was voided, a ballot that all agree would have been determinative of the election, the election should be overturned. The Company asserts that this voided ballot shows voter confusion due to language difficulties. This conclusion, while possible, does not necessarily follow from the existence of a voided ballot. The fact that the person neatly checked all of the boxes and wrote "yes" at the top could also indicate that he or she comprehended the ballot to some degree but did not know how to vote.[8] In any event, it is impossible to conclude, based on the voided ballot alone, that the vote would have been different had an Haitian–Creole interpreter been present. The person so voting may not have even been Haitian. Without any evidence of voter confusion resulting from the failure to provide an Haitian–Creole interpreter, the voided ballot should not be a ground for finding an abuse of discretion.

The Company asserts that the NLRB's decision not to provide an interpreter is inconsistent with the NLRB's holding in *Gory Associated Industries, Inc.*, 275 NLRB 1303, 1303, 1985 WL 45580 (1985), where the Board overturned an election because an Haitian–Creole interpreter was not available for a portion of the election proceedings. In *Gory, id.*, however, the NLRB had clearly agreed prior to the election to provide an Haitian–Creole interpreter. *Gory* therefore stands only for the proposition that the NLRB must adhere to the promises it makes. In the case at bar, the NLRB had

not promised to provide an interpreter; to the contrary, the NLRB denied the Employer's pre-election request for an Haitian–Creole interpreter.

In arguing that an Haitian interpreter should have been made available, the Company has relied on the concurring opinion in *Alco Iron & Metal Co.*, 269 NLRB 590, 1984 WL 36215 (1984), which states, in pertinent part, "where a Regional Office is on notice that a substantial percentage of the electorate do not speak English, the Board must attempt to fulfill its responsibility to protect the integrity of the election process by supplying a Board agent, or ... interpreter, capable of speaking the language of those employees so far as the particular circumstances permit." *Id.* at 592. The Board majority, however, has yet to impose such a blanket requirement.[9] Since the Court ordinarily defers to the Board on representation matters, we take no position on whether such a blanket requirement would be appropriate. Nor do we find that the facts presented here warrant concluding that an Haitian–Creole interpreter should have been provided in this circumstance.

The Board's decision to certify the Union despite having failed to provide advance notice that a Portuguese interpreter would be present at the election similarly does not constitute an abuse of discretion. The Company claims that a strong possibility exists that some Portuguese-speaking Employees either did not participate in the election because they were under the impression that no interpreter would be provided or that those Employees who did participate did not know an interpreter was present. The Company thus argues that eligible voters who spoke only Portuguese were disenfranchised by the regional office's failure to commit itself in advance of the election to providing a Portuguese interpreter. The Company, however, presents no evidence that any Portuguese Employees did not vote or were con-

---

**8.** The Board even posits in its brief the possibility that the voter could have intended to cast a voided ballot.

**9.** Given the concurring opinion's acknowledgement that "particular circumstances" may not

allow for an interpreter to be provided, *id,* it is even questionable whether any Board member advocates that an absolute requirement be imposed.

fused in voting because of the NLRB's failure to inform the Company beforehand that the interpreter would be available. The Court will not overturn the election based simply on a mere assertion that the failure to give advance notice was prejudicial.

The Company's remaining argument is that the Union should not have been certified on public policy grounds because the International Brotherhood of Teamsters and the U.S. government entered into a consent decree in March 1989 with respect to a civil RICO action. As this argument was not raised in any of the proceedings before the NLRB, it cannot be considered by the Court. *See* 29 U.S.C. § 160(e); *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665, 102 S.Ct. 2071, 2082, 72 L.Ed.2d 398 (1982); *Newton–New Haven Co.,* 506 F.2d at 1038.

## CONCLUSION

Based on the foregoing, the Court grants enforcement of the Board's order dated September 30, 1993.