89 F.3d 586
 152 L.R.R.M. (BNA) 2816, 65 USLW 2103,
132 Lab.Cas. P 11,623,
97 Cal. Daily Op. Serv. 5135,
96 Daily Journal D.A.R. 8271
 GARDNER MECHANICAL SERVICES, INC.; Gardner Engineering,
Inc., Petitioners-Cross-Respondents,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner,
Local 350, United Association of Journeymen and Apprentices
of the Plumbing and Pipe Fitting Industry of the
United States and Canada, AFL-CIO,
Respondent-Intervenor.
 Nos. 94-70192, 94-70262.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted August 18, 1995.
Decided July 10, 1996.
 
 1
 Robert G. Hulteng, Jeffrey S. Bosley, Littler, Mendelson, Fastiff, Tichy & Mathiason, San Francisco, California, for petitioner-cross-respondent, Gardner Mechanical Services, Inc.
 
 
 2
 Charles Donnelly, John J. Fawley, National Labor Relations Board, Washington, D.C., for respondent-cross-petitioner National Labor Relations Board.
 
 
 3
 John J. Davis, Jr., McCarthy, Johnson & Miller, San Francisco, California, for respondent-intervenor U.A. Local 350.
 
 
 4
 Petition to Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 
 
 5
 Before: KOZINSKI and JOHN T. NOONAN, Jr., Circuit Judges, BREWSTER, District Judge.*
 
 BREWSTER, District Judge:
 
 6
 Gardner Engineering, Inc. ("GEI") and Gardner Mechanical Services, Inc. ("GMS") seek review of the National Labor Relations Board's order finding that GMS and GEI engaged in unfair labor practices in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("the Act"). 29 U.S.C. §§ 158(a)(1) and (5). The National Labor Relations Board ("the Board") filed a cross-application for enforcement of its order, and Local 350, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry, AFL-CIO ("the Union") intervened in support of the Board's order. We modify the Board's order, and ENFORCE the Board's order as modified.
 
 
 7
 * Located in Reno, Nevada, GEI was engaged in the business of installing and servicing heating, air conditioning, and piping systems. GEI was a member of the Nevada Association of Mechanical Contractors, Inc. ("the Association"). On GEI's behalf, the Association negotiated and entered into two collective-bargaining agreements with the Union. One of these was a service agreement that covered GEI's service employees' wages, hours, and working conditions (hereinafter "the Service Agreement"). The Service Agreement was effective from May 2, 1988 to and including May 1, 1990.
 
 
 8
 On May 19, 1989, GEI informed its service employees that GEI was closing its service operations effective that day, but that work would be available at GMS. Each employee was advised that employment by GMS was conditioned on acceptance of employment as a new, unrepresented employee. GEI advised employees who wished to maintain their union benefits to return to the Union hiring hall. At least one Union member chose not to work for GMS and returned to the Union hiring hall. The other employees, including four Union members, completed application forms and began employment with GMS. One other Union member began work at GMS one week later.
 
 
 9
 On June 19, 1989, the Union filed unfair labor practice charges with the Board alleging that GMS was a "disguised continuance" of the GEI service department. The Union further alleged that GEI had unlawfully withdrawn recognition of the Union and failed to apply the terms of the Service Agreement. An Administrative Law Judge commenced a hearing on the matter on October 18, 1989. The next day, the parties settled. The resulting Settlement Agreement provided, among other things, that GEI would pay $12,000 to the Trust Funds in settlement of the claims, continue to pay the appropriate Trust Funds benefits for five Union-member employees, and participate in a secret ballot election.
 
 
 10
 Pursuant to the Settlement Agreement, arrangements were made for a secret ballot election at GMS to determine whether the majority of employees favored Union representation. One and a half weeks before the election, James Gardner, the sole shareholder of both GMS and GEI, reminded employee Robert Adair that Gardner had been allowing Adair to take a company truck home at night and had paid for the registration of the truck on Adair's behalf. Gardner said he hoped Adair would keep this in mind when he voted in the upcoming election. Gardner also handed Adair a list of employees' names with headings of "yes," "no," and "comments" after each name. He asked Adair to fill in entries indicating how Adair thought each employee would vote and then to return the list to Gardner. Although Adair accepted the document, he later discarded it after deciding that it was improper to fill it out as Gardner had requested.
 
 
 11
 Shortly before the election, Gardner learned that the Union and the Association agreed, in negotiating a successor to the Service Agreement that would expire May 1, 1990, to a 40-cent per hour wage increase effective May 1, 1990 and a 20-cent per hour increase six months later. On May 3, 1990--the day before the election--Gardner informed employees that if they voted against Union representation he would make them eligible for a profit-sharing plan. Gardner also promised that regardless of the election's outcome, he would give them a 50-cent per hour wage increase. He noted, in contrast, that employees covered by the successor service agreement would receive only a 40-cent per hour wage increase. Gardner failed to mention the additional 20-cent per hour wage increase six months later.
 
 
 12
 On May 4, 1990, the secret ballot election was held. Two employees voted in favor of Union representation, and nine voted against it. Following the election, GMS ceased recognition of the Union, and imposed changes in employment conditions without notice to the Union. On October 5, 1990, GMS discharged Adair, who had been acting as a spokesperson for the employees and voicing their various complaints to the management.
 
 
 13
 On October 23, 1990, the Union filed a motion with the ALJ seeking to set aside the Settlement Agreement on the grounds that the Union had been fraudulently induced to enter into it. The Union claimed that at the time it entered into the Settlement Agreement it was unaware that there were GMS service employees who were not members of the Union. In his ruling on July 24, 1991, the ALJ found that as of October 19, 1989, the day the settlement was signed, the Union was aware that GMS had service employees who were not Union members and denied the motion to vacate the Settlement Agreement.
 
 
 14
 Next, Adair and the Union separately filed charges against GEI and GMS, as a single, integrated business enterprise and employer. Their complaints were consolidated. They alleged that GMS had violated sections 8(a)(1), (3), and (5) of the Act by: (1) asking Adair to poll other employees as to how they planned to vote in the May 4, 1990 election; (2) discouraging employees from voting for Union representation by promising a 50-cent per hour wage increase prior to the election; (3) withdrawing recognition of the Union's representation after the election; (4) changing the working conditions after the election without notice to or bargaining with the Union; (5) barring employee discussion of Union representation; (6) threatening employees with reductions in benefits if they secured Union representation; and (7) discharging Adair because of his Union activities. Finding that GEI and GMS constituted a single enterprise for the purposes of the Act, the ALJ ruled that GEI and GMS (collectively "the Company") violated the Act by its pre-election conduct. Accordingly, the ALJ vacated the election results as invalid. The ALJ ordered the Company to cease and desist its violative conduct, to reinstate Adair, and to post a notice to employees of the effect of the rulings.
 
 
 15
 On February 28, 1994, upon review, the Board expanded and affirmed the ALJ's order. The Board agreed with the ALJ that the Company's pre-election conduct violated the Act and precluded the Company from relying on the election as evidence that the Union did not represent the majority of the employees. However, the Board rejected the ALJ's conclusion that the presumption of continuing Local 350 support among the unit employees after May 1, 1990 was untenable. The Board found insufficient evidence to establish that the Service Agreement was a "members-only" agreement, incapable of carrying a presumption of majority support.
 
 
 16
 The Board thus modified the ALJ's order by ordering the Company to bargain with the Union as the representative of the employees in the service unit, to rescind any unilateral changes to the terms of work, and to compensate the employees for any losses suffered as a result of the unlawful unilateral changes. With these modifications, the Board affirmed the ALJ's order. Requesting this Court to deny enforcement of the Board's order, GEI and GMS filed this petition for review. The Board filed a cross-application seeking enforcement, and the Union intervened in support.
 
 II
 
 17
 Under section 10(e) of the Act this Court reviews the Board's ruling to determine whether it is supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951); NLRB v. International Brotherhood of Electrical Workers, Local 77, 895 F.2d 1570, 1573 (9th Cir.1990). The Board "has the primary responsibility for developing and applying national labor policy," and its rules are accorded "considerable deference." NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990). This Court "will uphold a Board rule as long as it is rational and consistent with the Act, ... even if we would have formulated a different rule had we sat on the Board." Id. at 787, 110 S.Ct. at 1549 (citations omitted). Even if a Board rule represents a departure from the Board's previous policy, it is entitled to deference. Id.
 
 
 18
 A. There is Substantial Evidence to Support the Board's Decision that the Union was the Representative of the Employees
 
 
 19
 "Upon certification by the NLRB as the exclusive bargaining agent for a unit of employees, a union enjoys an irrebuttable presumption of majority support for one year." Id. at 777-78, 110 S.Ct. at 1544. The presumption of majority support is also irrebuttable during the term of a collective-bargaining agreement. NLRB v. Buckley Broadcasting Corp., 891 F.2d 230, 232 (9th Cir.1989), cert. denied, 496 U.S. 925, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990). Upon expiration of the collective-bargaining agreement, the presumption becomes rebuttable. Id.
 
 
 20
 In the present case, the Service Agreement expired after May 1, 1990. The ALJ and Board found that the Company's pre-election conduct violated the Act and precluded the Company from relying on the election to justify its refusal to recognize the Union as the employees' bargaining agent and its adoption of unilateral terms and conditions of work.
 
 
 21
 The Company contends that the presumption of majority support did not arise unless the parties intended to form a collective bargaining relationship. However, under UA Local 343 of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. v. Nor-Cal Plumbing, Inc., 48 F.3d 1465 (9th Cir.1994), cert. denied, --- U.S. ----, 116 S.Ct. 297, 133 L.Ed.2d 203 (1995) (No. 94-2102), a collective bargaining agreement with a union firm may be extended to a non-union firm where the employees of both firms constitute an appropriate bargaining unit and where the following criteria weigh in favor of a finding of "single employer": (1) common ownership; (2) common management; (3) interrelation of operations; and (4) centralized control of labor relations. Id. at 1470-71. The Company ignores the finding made by the ALJ and the Board, which we find to be supported by substantial evidence, that the Service Agreement between GEI and the Union extends to GMS because GEI and GMS constitute a single employer. As long as the Service Agreement is a valid collective bargaining agreement, the argument that a presumption of majority status never arose with regard to GMS because it was not a party to the agreement is unpersuasive.
 
 
 22
 The Company also argues that a presumption of majority status never arose because the Service Agreement was a "members-only" agreement, which applied only to those service employees who were Union members. "Members-only" contracts do not give rise to a presumption of majority status on the part of the Union. Arthur Sarnow Candy Co., 306 N.L.R.B. 213, 215-16, 1992 WL 19878 (1992), enf'd, 40 F.3d 552 (2d Cir.1994).
 
 
 23
 The Union contends that the Company effectively waived its "members-only" argument by failing to except to two prior rulings. The first prior ruling was the Board's unpublished November 6, 1991, Decision and Order which rejected the ALJ finding of a "members-only" agreement. The Board, did not, however, suggest that this finding was erroneous on the merits, but instead found that it was improper because the issue had not been litigated. The Company's failure to except to this ruling cannot be seen as an intention to waive the argument.
 
 
 24
 The second ruling referred to by the Union was the second ruling by the ALJ on March 23, 1993, which found the Service Agreement to be a "members-only" agreement. Although the Union and the Board filed exceptions to this holding, the Company did not. The Company cannot be said to have waived its "members-only" argument for failing to except to a ruling in its favor. Furthermore, the Board's reliance on Woelke & Romero Framing v. NLRB, 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982), reh'g denied, 459 U.S. 899, 103 S.Ct. 198, 74 L.Ed.2d 159 (1982), in support of its waiver argument is misplaced. In Woelke, the Court of Appeals lacked jurisdiction to decide an issue not raised before the Board by either party. Id. at 665-66, 102 S.Ct. at 2082-83. In contrast, both the Union and General Counsel in the instant case excepted to the ALJ's finding of a members-only agreement. Unlike the circumstances in Woelke, therefore, the pertinent issue was clearly before the Board. Because the Company did not waive its members-only argument, we must determine whether substantial evidence supports the Board's finding that the Service Agreement was not a "members-only" contract.
 
 
 25
 In Brower's Moving & Storage Inc., 297 N.L.R.B. 207, 1989 WL 224448 (1989), enforced, 914 F.2d 239 (2d Cir.1990), cert. denied, 499 U.S. 905, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991), the collective-bargaining agreement at issue unambiguously covered all employees in the bargaining unit--both union and nonunion. Nevertheless, the company argued that the agreement was a "members-only" agreement. Id. at 208. The union had never been informed of the company's employees who were not union members. Id. at 209. In addition, the company had never told the bargaining unit employees that they were represented by the union or that there was an applicable contract. Id. Although the collective bargaining agreement had been applied only to the employees who were union members, the Board found no evidence that the union acquiesced in a repudiation of portions of the contract or that the union and the company ever had an arrangement that would negate an intent to enter into a valid collective-bargaining relationship. Id.
 
 
 26
 Similarly, there is no showing in the present case that the Union acquiesced in a "members-only" application of the Service Agreement. The Service Agreement itself reflects no intent to limit application of the agreement to only Union members. The document unambiguously establishes the Union as the exclusive bargaining representative for all employees performing bargaining unit work. There is no evidence that the Union knew about the non-Union service employees at GMS until the signing of the Settlement Agreement on October 19, 1989. Although there is some showing of disparate treatment of the Union and non-Union members, there is no showing that the Union knew of, or should have known of, this disparate treatment. We are not persuaded therefore that the Union can be said to have acquiesced in this disparate treatment. Pursuant to the Settlement Agreement, as clarified by the ALJ at the hearing approving the Settlement Agreement, the Company recognized the Union as the exclusive representative of all employees in the service unit. In sum, there is substantial evidence for the Board's finding that the Service Agreement was not a "members-only" agreement.
 
 
 27
 In order to overcome the presumption of majority status the Company must show at the time it refused to bargain, "either (1) the union did not in fact enjoy majority support, or (2) the employer had a 'good-faith' doubt, founded on a sufficient objective basis, of the union's majority support." Curtin Matheson Scientific, Inc., 494 U.S. at 778, 110 S.Ct. at 1545 (emphasis in original). High or low union membership is only marginally relevant to this determination; employees may be supportive of the union, but choose not to join. NLRB v. Tahoe Nugget, Inc., 584 F.2d 293, 307 (9th Cir.1978), cert. denied, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979), reh'g denied, 444 U.S. 887, 100 S.Ct. 187, 62 L.Ed.2d 122 (1979). In the instant case, the Company has made no showing sufficient to rebut the presumption of majority support and therefore was not entitled to make changes to its employment practices without negotiating with the Union.
 
 B. A Bargaining Order is Inappropriate
 
 28
 A bargaining order is an "extreme remedy" authorized "where an employer's conduct during an election campaign is so disruptive as to taint any 're-run' election." NLRB v. Anchorage Times Pub. Co., 637 F.2d 1359, 1368 (9th Cir.1981).[1] When the Board utilizes a bargaining order to remedy unfair labor practices, the Board "must make findings which are sufficiently explicit to support issuance of [the] bargaining order. The Board must 'clearly articulate the reasons behind [the] order, and particularly why other remedies were found inappropriate.' " NLRB v. Davis, supra, 642 F.2d at 354 (citing NLRB v. Pacific Southwest Airlines, 550 F.2d 1148, 1153 (9th Cir.1977)). These findings may not be perfunctory. Davis, supra, 642 F.2d at 354; NLRB v. Western Drug, 600 F.2d 1324, 1326 (9th Cir.1979).
 
 
 29
 In this case, the Board modified the ALJ's findings by ordering the Company to bargain with the Union as the representative of the employees. The Board, however, made no findings whatsoever as to the necessity of a bargaining order, or the propriety of any other, less drastic remedies. Under such circumstances, the bargaining order was not warranted. See Western Drug, 600 F.2d 1324, 1326-27 (9th Cir.1979) (bargaining order inappropriate where Board provided insufficient grounds to conclude that an election would not reflect employees' true wishes).
 
 
 30
 An order requiring a new election is the more appropriate remedy. There has been no finding that the unfair labor practices in this case are so severe or pervasive as to make a fair election impossible. See NLRB v. Peninsula Ass'n for Retarded Children and Adults, 627 F.2d 202, 204-205 (9th Cir.1980). Moreover, "an election remains the preferred method for selection of a bargaining unit's representative." Id.; See NLRB v. Gissel, supra, 395 U.S. at 602, 89 S.Ct. at 1934. "Only an election guarantees employees their choice of representative." Peninsula, supra, 627 F.2d at 205.
 
 
 31
 This Court has authority to "make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." 29 U.S.C. § 160(e) & (f); Dash v. NLRB, 793 F.2d 1062, 1069 (9th Cir.1986). Accordingly, we modify the Board's Feb. 28, 1994 order by vacating the bargaining order, and requiring that a new election be held. All other aspects of the Board's Feb. 28, 1994 order are sustained.[2]
 
 
 32
 The Board's order is ENFORCED as modified.
 
 
 
 *
 The Honorable Rudi M. Brewster, United States District Judge, Southern District of California, sitting by designation
 
 
 [1]
 In NLRB v. Gissel Packing Co., the United States Supreme Court set forth two situations in which a bargaining order is appropriate: 1) " 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices," and 2) "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." 395 U.S. 575, 613-14, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969)
 When a case falls into the second category, a bargaining order is warranted if "(1) the union demonstrates that it represented a majority of the of the unit employees ..., (2) the employer committed unfair labor practices, and (3) those practices are bad enough to undermine the free election process." NLRB v. Davis, 642 F.2d 350, 352 (9th Cir.1981).
 
 
 [2]
 With respect to the unchallenged findings in the Board's order, the Board is entitled to summary enforcement. Sparks Nugget, Inc. v. NLRB, 968 F.2d 991, 998 (9th Cir.1992)